ARCULARIUS and others, ex'rs, &c. appellants, *vs.* SWEET, adm'r, &c. respondent.

A testator, by his will, instructed his executors to invest one-third of the proceeds of his whole estate, and to pay the interest to his wife during her life. Among other legacies was one of $5000 to his executors, in trust to pay the interest to his son J. S. during life, and upon his decease, to pay the capital to his "right heirs," afterwards altered, by a codicil, to his "issue," if any surviving, and if none, then $1000 to his widow, if any, and the remaining $4000 to sink into the residuum of his estate. J. S. died soon after the testator, leaving a widow, (who took the $1000,) but no children. The 18th section of the will was as follows: "I give and bequeath all the rest, residue and remainder of my estate to my children by my present wife P. (of whom J. S. was one,) together with the share of my estate set apart for my said wife during her natural life; upon her decease equally to be divided among them."

*Held,* that this was a bequest of the whole residuum, including the widow's third, equally to her children, to become vested in interest immediately on the testator's death, subject only to their mother's right to one-third of the income, during her life; that the distribution was to be made immediately, without waiting for the widow's death; and that the personal representative of J. S. was entitled to share in the residue, (including the $4000,) equally with the others.

In the interpretation of a will, punctuation may perhaps be resorted to, when no other means can be found, of solving an ambiguity; but not in cases where no real ambiguity exists except what punctuation itself creates.

THIS was an appeal from a decree of the surrogate of New York, directing an account by the executors of George Arcularius deceased, in favor of William P. Sweet, administrator of Jacob S. Arcularius; and involved the construction of the will of George Arcularius, in respect to the provisions therein made for the said Jacob S. Arcularius. George Arcularius, the father of Jacob S., by his will gave to his widow, for life, the income of one-third of his whole estate. He gave to his several children, or to trustees for them, $5000 or $7000 each, as they had received advances in his lifetime or not. Among others, he gave to trustees for Jacob S. $5000 in trust to pay the income to him during his life, and to pay the principal, on his decease, " to the right heirs of his said son Jacob S." He gave all the residue of his estate as fol-

lows : " to my children by my present wife Phebe, together with the share of my estate set apart for my said wife during her natural life upon her decease equally to be divided among them." Jacob S. died shortly after his father. The surrogate decided that he and his administrators were entitled to a share in the residuary estate; that the whole share vested in him immediately on his father's death; the part reserved for the widow's use being postponed for the purposes of payment only, to her death, and the rest to be paid at the testator's decease. (*See S. C.* 3 *Brad.* 64, 114.)

*John T. Hoffman,* for the appellants.

*S. P. Nash,* for the respondent.

ROOSEVELT, J. This is an appeal to the supreme court, from a decision of the surrogate directing the distribution of the estate of the late George Arcularius, among his widow and children. The testator, it appears, was twice married, and left at his death a numerous family in both branches, and an estate valued at from eighty to one hundred thousand dollars, all in cash, or directed by him to be sold and turned into cash. By his will he instructed his executors to invest one-third of the proceeds of his whole estate in good securities, and to pay the interest to his wife during her life. Among numerous other legacies, amounting together to $40,000 and upwards, was one forming the subject of the present controversy, of $5000 to his executors in trust to pay the interest to his son Jacob S. during life, and upon his decease to pay the capital to his " right heirs," afterwards altered, by a codicil, to his " issue," if any surviving, and if none, then $1000 to his widow, if any, and the remaining $4000 " to sink into the residuum of my estate." Jacob died soon after his father, leaving a widow, (who took the $1000,) but no children; and the question is, to whom does the $4000 belong, and when is it payable?

The 18th section of the will, the punctuation of which is sup-

Arcularius *v.* Sweet.

posed to create the difficulty as to the time of payment, is as follows : " I give and bequeath all the rest, residue and remainder of my estate to my children by my present wife Phebe, (Jacob was one of them) together with the share of my estate set apart for my said wife during her natural life upon her decease equally to be divided among them."

Independently of punctuation, the plain meaning of these words is a bequest of the whole residuum, including the widow's third, equally to her children, to become vested in interest, immediately on their father's death, subject only to their mother's right to one-third of the income during her life, and which she at any time might relinquish, if she saw fit. The law, too, in cases of ambiguity, leans in favor of the vesting of a legacy or devise. It allows, to a certain extent, but does not favor, suspensions of ownership. But the punctuation, it is contended, imperatively requires a different interpretation from the otherwise natural .one. " The semicolon (after the word life) is material (say the defendants' counsel) to a correct reading ; and being there, must have its effect." That effect would be to postpone *any* distribution till the mother's death—to tie up not only the securities set apart for her income, but those also from which they were directed to be set apart, and which were expressly discharged from any trust, and as to the income of which no disposition was made. A single dot over a comma, so easily inserted by mistake or design, and so difficult, if not impossible in most instances, of proof or disproof, can never be allowed thus to overturn the natural meaning of the written words, whether taken by themselves or in connection with the whole instrument. The powers of the federal government, it was once said, depended on a comma ; and parties divided on a semicolon. One side read in the constitution that congress should have power " to lay taxes to pay (that is in order ·to pay) the debts and provide for the common defense and general welfare ;" the other, that the powers given were independent, " to lay taxes ;" " to provide for the general welfare," &c. The semicolon interpretation was finally overthrown, and the written words and natural sense prevailed over " stops ;" and it is now

settled, both judicially and politically, that congress has no un-
limited power, and that the general welfare clause is a mere
qualification of the power to lay taxes.   Punctuation may per-
haps be resorted to when no other means can be found of solv-
ing an ambiguity; but not in cases where no real ambiguity
exists except what punctuation itself creates.

It is next insisted that, upon an examination of the whole will,
it is apparent that even if the $4000, on the death of Jacob, passed
immediately to the residuary legatees, instead of waiting for
distribution till the death of his mother, still the administratrix
of Jacob, who is the appellant in this case, has no right to any
part of it, either then or now.   The difficulty arises from the
seeming absurdity of first giving to a person a life interest, and
then, on his death, giving to the same person the capital; a be-
quest, in other words, by way of remainder, to take effect in a
contingency which assumes the legatee at the time to be dead.
Viewed in the light of legal principles this objection vanishes.
The gift, in effect, is to Jacob for life, and on his death to his
issue, if he leave any; and if none, as actually occurred, then to
such persons as he may have designated by will or deed; and
in default of a deed or will of the party, to his legal represent-
atives, whoever they may be.

It will be observed that the primary object of the clause in
question was to dispose of a mere residuum, and that the $4000
was to form a part of the residuum, not absolutely, but only in
the event of the legatee for life leaving no issue.   All the
special wishes of the testator had been already provided for in
detail.   He was not likely, therefore, to be particular in this
sweeping clause.   At all events, the language used by him is
plain and unequivocal.   " All the residue " I give " to my children
(not a part of them) by my present wife."   He qualifies, it will
be seen, the generality of the bequest by confining it to the chil-
dren (meaning of course, as the language necessarily imports, all
the children) of his second wife; and the express insertion of
this qualification, and the omission at the same time of any
other, excludes all inference that he intended any other.   Had
he meant all my children except those by my first wife, and

Arcularius *v.* Sweet.

" except Jacob, by my second," it is manifest he would have said so.

It is unnecessary to dwell further on this case. The reasoning of the surrogate, and the authorities cited by him in support of his decree, are conclusive. To go over, at length, the whole ground again, would be a useless repetition. Decree affirmed, with costs.

MITCHELL, P. J. The clause, "together with the share of my estate set apart for my said wife during her natural life, upon my decease," may be read as in parenthesis. Then clearly the residue, leaving out that invested for the widow, is vested immediately, and payable immediately on the testator's decease. The testator also wished to dispose of the capital that was reserved for the use of the widow, and wished that to go in the same direction ; but as the income of it was to be hers, he gave it, upon her decease, to the residuary legatees ; not to postpone the vesting, but to prevent any doubts that the income was to be hers during her life.

By a codicil the testator revoked the bequest of the $5000 to the right heirs of Jacob after his death, and gave it to the issue of Jacob, if he left any. If he left none, then $1000 to his widow if she should survive him, and directed that the remaining $4000 should sink into the residuum. It is argued that this shows that the testator could not have intended that Jacob himself should have any part of the residue. It however only shows that he intended the $4000 to go into the residue, and that the residue should go as he had previously directed by his will ; whether to Jacob or to any one else.

The codicil also declared that the devises contained in the 7th, 8th, 9th, 10th, 11th and 13th clauses of his will (the 13th was the bequest for Jacob) were to be paid to the devisees without any deduction for advances made by the testator to them, it being his will to forgive them their debts *upon their accepting the devises* made to them. It is contended that the words " upon their accepting " is a condition precedent to the exemption from paying advances. If it were so, as the bequest was

beneficial to Jacob, it may be presumed that he assented to it, unless he showed, by some act, his ·dissent. Besides, the exemption is made in terms that are absolute : "I declare that the bequests are to be paid to the devisees without any deduction for advances made to them." This being completed, the testator proceeds to show more fully his wish to forgive the debts due to him by his sons, and says, " it being my will to *forgive* them their debts, respectively, upon their accepting the devises made to them." The devises were accepted, when they *vested* in the devisees. It may be that the testator intended that the debts should not be forgiven, if the legacy never vested in the legatee; as if the legatee died before him. And with that intent he may have used the words " upon their accepting the devises."

The decree of the surrogate should be affirmed, with costs.

PEABODY, J., concurred.

Decree affirmed.

[NEW YORK GENERAL TERM, September 14, 1857. *Mitchell, Roosevelt* and *Peabody*, Justices.]